## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARLEN SHAW, | : | No. 3:05cv1344 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| v. | : | |
| | : | |
| CHAMBERLAIN MANUFACTURING | : | |
| CORP., d/b/a CHAMBERLAIN, | : | |
| JIM NAYAVICH, JAMES FLAHERTY, | : | |
| and DAURICE HOLLY-FEBBO, | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the Court for disposition is the Defendants' Joint Motion for Summary Judgment. This matter has been fully briefed and is ripe for disposition. For the following reasons, Defendants' motion for summary judgment is granted.

### I.    Background

Plaintiff Arlen Shaw is currently an employee at Defendant Chamberlain Manufacturing Corp's manufacturing facility in Scranton, Pennsylvania. Chamberlain manufactures mortar shells for the military. At all relevant times, Defendant Jim Nayavich was the Human Resource Manager, Defendant James Flaherty was the company's President, and Defendant Daurice Holly-Febbo was a Supervisor and Nurse.

Shaw began working for Chamberlain in March 1998 under the job classification "laborer." (Doc. 22-8, Pl. Ex., Shaw Dep. Tr. ("Shaw Dep") 9, 14) This job classification was determined by a collective bargaining agreement. (Id. at 10) Shaw was a laborer until July 1998, when he became a skilled operator. (Id. at 10-11). In September or November of

1999, based on negotiations between his union and Chamberlain, he returned to the laborer job classification.  (Id. at 11)  Under the current collective bargaining agreement, laborer is the only classification available for the Scranton facility, and it encompasses jobs in three primary manufacturing areas: the forge facility, the heat treat area, and the production area. (Def. Ex. V, Nayavich Decl. ¶ 7)  Chamberlain does not guarantee employees work in a specific area or specific job because production needs are sporadic and change regularly.  (Id. ¶ 8)  Although there are tasks in the facility that would qualify as "light duty"[1] work, Chamberlain does not provide permanent "light duty" positions, but only assigns  temporary light duty work to employees with injuries who anticipate returning to their pre-injury jobs. (Id. ¶ 9)

Shaw injured his shoulder in October of 1998.  (Shaw Dep. 33; Doc. 22-7, Chamberlain Dep.[2] 33)  At the time, he was working in a position that required him to remove a heavy mortar shell from the assembly line, place it in a machine, and place it back on the conveyor line after the machine completed it function.  (Shaw Dep. 34-35)  After two or three weeks of this repetitive motion, his shoulder became sore.  (Id.)  Then, Chamberlain placed him in a position requiring that he handle a lighter, 30 pound shell.  (Id. at 35-36) While performing this task, he reached for a shell and felt a shooting pain from his right

---

[1] Under Chamberlain's definition, as well as the definition of Plaintiff's treating physician, light duty work involves lifting anywhere from ten to twenty-five pounds.  (See Def. Ex. F, Dr. Mogerman Return to Work Evaluation, Sept. 10, 2003).

[2] Chamberlin's deposition consists of the testimony its corporate designees pursuant to Federal Rule of Civil Procedure 30(b)(6).

shoulder to his fingertips, followed by a few moments of numbness.  (Id.)  He reported the injury to the on-site nurse, who gave him some pills and released him to finish his shift.  (Id. at 36)  Although he did not initially miss work, he visited the doctor for Chamberlain, Dr. Joseph Greco, who restricted him to lifting twenty to twenty-five pounds for a week until he returned for a follow-up appointment.  (Id. at 37)  Dr. Greco then referred Shaw to Dr. Jack Henzes, who examined him three times.  (Id. at 38)

Shaw continued to work with restrictions until Dr. Jeffrey Mogerman performed surgery on his shoulder in May 1999.  (Id. at 37)  After his surgery, Shaw was on leave until October 25, 1999.  (Id. at 38)  When he returned to work following the surgery, he was placed in the skilled operator classification for several months.  (Id. at 39)

Within three months of the surgery, Shaw was terminated because he had trouble performing as a result of his shoulder.  (Id. at 11-12, 49)  Shaw arbitrated his termination, and the arbitrator reinstated him.  (Id. at 49)  Shaw was out of work for six months as a result of the termination.  (Id. at 50)  When he returned, he was under no restrictions and he worked as a skilled operator with "adaptors."  (Id.)  This job required that he take a five to eight pound piece of metal and place it in a machine to cut it, then take it out of the machine and place it in another machine to cut the opposite side.  (Id. at 46-47)  After two months, a problem arose with Shaw's performance, and he agreed to accept a demotion from skilled operator to laborer.  (Id. at 51)

In December of 2001, Shaw re-injured his shoulder while working as a maintenance

3

laborer.  (Id. at 59-60)  In this position, he cleaned the machines to keep them in proper

working condition.  (Id. at 60)  On the date he was injured, there was a flood, and he cleaned

up the water using a 55 gallon drum with a vacuum system.  (Id. at 61)  After drawing in the

water, he disposed of it in a chemical disposal holding tank.  (Id.)  During the course of his

eight hour shift, he made approximately a dozen trips from the flood to the chemical disposal

tank.  (Id. at 61-62)  When he woke up the next morning, he could not move his arm.  (Id. at

62)  Prior to the re-injury, he was under no work restriction.  (Id.)

The next day, he reported his injury to his supervisor, who advised him to see the

nurse.  (Id. at 63)  The nurse advised him to see Dr. Greco.  (Id.)  Dr. Greco placed

restrictions in his lifting and prohibited him from using his arm over his head.  (Id.)  Dr.

Greco additionally wanted him to see Dr. Mogerman within a week because Dr. Mogerman

had previously performed Shaw's surgery.  (Id. at 64)

Dr. Mogerman examined him and ordered that he continue working with modified

duties until he had the opportunity to reexamine him in March of 2002.  (Id. at 68)  At that

time, Shaw was placed on painting duty.  (Id. at 68)  Dr. Mogerman again examined Shaw on

April 8, 2002, and ordered that he continue in "sedentary" work.  (Id. at 70)  Dr. Mogerman

explained that Shaw suffered from impingement syndrome in his shoulder, and could lift

between zero and ten pounds.  (Def. Ex. F., Mogerman Return to Work Evaluation, Apr. 8,

2002)  Thus, Shaw continued painting.  (Shaw Dep. 70)  While Shaw worked with

restrictions, he continued working eight hours a day, five days a week, at the same rate of pay

4

he received when he worked without restrictions.  (Id.)

On May 20, 2002, Dr. Mogerman advised that Shaw had improved and could lift no more than fifteen pounds, and was able to perform the "felt pack" job.  (Id. at 75-76)  This job required that Shaw fill a 120 millimeter shell with sponges.  (Id. at 76-77)  Despite Dr. Mogerman's advice, Shaw felt packing the sponges aggravated his shoulder because it required that he use a hammer.  (Id. at 77-78)  After reporting the aggravation, Shaw continued packing the sponges but Chamberlain assigned another employee to perform the hammering.  (Id. at 78)

On July 8, 2002, Dr. Mogerman completely restricted Shaw from working until he had the opportunity for another observation on July 22, 2002.  (Id.)  On July 22, 2002, Dr. Mogerman continued Shaw's leave until yet another examination on August 12, 2002.  (Id. at 79).  On August 12, Dr. Mogerman counseled that Shaw should remain off work until September 5, 2002, at which time he could return to light duty work as a floor scrubber pending further examination on September 25, 2002.  (Id. at 80)  Floor scrubbing required that Shaw sit in and drive a machine that swept and scrubbed the floors.  (Id. at 80-81)

On September 25, Dr. Mogerman reexamined him and advised that he remain off work completely until October 9, at which time he again advised that he stay off work until October 30.  (Id. at 83)  On October 30, he allowed Shaw to return to work on November 18, 2002 on light duty work with no use of his right arm.  (Id. at  87-88)  On December 4, 2002, Dr. Mogerman advised that Shaw should again cease working until January 9, 2003, to allow

5

him time for physical therapy.  (Id. at 88)

Shaw, however, did not return to work on January 9, 2003, and from the time he

stopped working as a floor scrubber on September 24, 2002, he remained away from work

until June of 2004.  (Id. at 88-89, 149)  During this time, he periodically visited Dr.

Mogerman and discussed the possibility of working.  (Id. at 89-91)

In early June 2003, Dr. Mogerman wrote to Chamberlain to inform it that he did not

believe that Shaw would ever be able to resume his former position and he required a

permanent light duty position.  (Id. at 110, 112, 114)  On June 24, 2003, Defendant Daurice

Holly-Febbo wrote a letter to Shaw stating, "Your medical provider, Dr. Mogerman, states

you are unable to return to your pre-injury job and will have permanent restrictions.

Chamberlain does not have provisions in the light duty program to offer permanent light duty

job classification."  (Id. at 112)  Since Chamberlain did not have permanent light duty

positions, it requested the assistance of Karen Kane of P.A. Advocates to assist Shaw with

his re-entry into the work force.  (Id. at 113)  Shaw met with Kane and she arranged four

interviews for him with other employers.  (Id. at 115-116)

On September 10, 2003, Dr. Mogerman sent a letter to Chamberlain releasing Shaw to

return to work with restrictions.  (Id. at 118-119)  He stated that Shaw could lift in the ten to

twenty-five pound range, but could push or pull zero to five pounds with his right arm and

ten to twenty-five pounds with his left.  (Id. at 180)  He concluded that these restrictions

would be in place indefinitely.  (Def. Ex. F, Mogerman Return to Work Eval., Sept. 10,

2003).

On October 17, 2003, Chamberlain responded by informing Dr. Mogerman that it had

no permanent light duty positions, and thus could not rehire Shaw because Dr. Mogerman's

prognosis was for a permanent injury and restriction.  (Shaw Dep. 120-121; Def. Ex. F.

Chamberlain Letter to Dr. Mogerman, Oct. 17, 2003)  Shaw believes this was not true

because in the past employees performed light duty tasks.  (Shaw Dep. 120-121)  Shaw,

however, could not say specifically whether there were light duty tasks that needed to be

done at that time, he did not believe that permanent light duty positions were available, and

never knew of anyone in Chamberlain who held a permanent light duty position.  (Shaw Dep.

120-21)

On November 5, 2003, Dr. Mogerman again concluded that Shaw could lift only ten

to twenty-five pounds, and felt that Shaw was available for full time light duty work.  (Def.

Ex. F, Mogerman Return to Work Eval., Nov. 5, 2003)  On November 17, 2003, Shaw

visited Northeast Rehabilitation Associates for a functional capacity evaluation to test his

responses to physical exertion. (Shaw Dep. 124-25)  On December 27, 2003, Dr. Mogerman

reexamined Shaw and determined that Shaw was capable of resuming heavy work and could

lift 50-75 pounds.  (Id. at 127)  Around the same time, Shaw submitted to testing by Dr.

Greco, who, after performing range of motions tests, decided not to return Shaw to full duty.

(Id. at 135)  He opined within a reasonable degree of medical certainty that Shaw would

never be able to return to work without restrictions.  (Def. Ex. F, Dr. Greco Letter, Jan. 29,

2004)

In either December of 2003 or January of 2004, Shaw and his union representatives met with Chamberlain representatives to discuss the possibility of his return to work. (Shaw Dep. 135-37) Shaw discussed returning to work with thirty pound shells. (Id. at 138-39) During this meeting, Chamberlain's nurse and another official referred to Shaw as "disabled." (Id. at 138) When the official said he was disabled, Shaw explained, "the whole conversation was about me to come back [sic] to work and the way they were refusing and that, no, he is disabled, like if I am broke." (Id. at 218) Chamberlain, however, wanted further information because Dr. Mogerman's previous reports indicated that he was permanently restricted to light duty work, but the recent report indicated that he could lift 50 to 75 pounds. (Id. at 138, 141) Chamberlain desired that he submit to an independent medical examination (IME), and the union agreed. (Id. at 141-42)

On May 5, 2004, Dr. Mogerman completed another Return to Work Evaluation on May 5, 2004, again indicating that Shaw could perform his pre-injury duties and could lift 50 to 75 pounds. (Def. Ex. M) Shaw then submitted to the IME with Dr. Wolk at Allied Medical facility on May 24, 2004. (Shaw Dep. 149-50; Def. Ex. R) Dr. Wolk concluded that he had completely recovered from his shoulder injury and could return to work. (Def. Ex. R) Shaw then was permitted to return to work on June 28, 2004. (Shaw Dep. 149) When he returned, he had some restrictions, particularly in carrying shells for some distance. (Id. at 166-67) He could, however, frequently sit, walk, lift, bend, squat, climb, kneel, twist, or

stand.  (Id. at 167)  He could frequently use either hand.  (Id. at 168)  He was able to lift,

push, and pull 50 to 70 pounds.  (Id.)

On July 5, 2005, Shaw filed the instant four count complaint.  In Count I, he alleges

that Chamberlain violated the American with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-

17, by refusing to accommodate his request to return to light duty work.  In Count II, he

alleges that Chamberlain retaliated against him for his request for an accommodation in

violation of the ADA.  In Count III, he avers that Chamberlain violated the Pennsylvania

Human Relations Act, 43 Pa. Stat. Ann. §§ 951-63, by failing to provide him with light

duty work and by retaliating against him for his request for an accommodation.  In Count IV,

he avers that Defendants Nayavich, Flaherty, and Holly-Febbo individually discriminated

against him in violation of the PHRA.

## II.    Jurisdiction

Since a federal question is before the Court pursuant to the ADA, we have jurisdiction

over this dispute under 28 U.S.C. § 1331.  We have supplemental jurisdiction over the state

claims pursuant to 28 U.S.C. § 1367.

## III.   Standard

Granting summary judgment is proper if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing Fed. R. Civ.

P. 56(c)). "[T]his standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. <u>International Raw Materials, Ltd. v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. <u>Id.</u> Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. <u>Id.</u> at 324.

### IV.   Discussion

The ADA provides that: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.  In order to establish a prima facie case, a plaintiff must prove that he or she: (1) has a "disability"; (2) is a "qualified individual" able to perform the essential functions of his or her position with or without a reasonable accommodation; and (3) has suffered an adverse employment action because of that disability.  Deane v. Pocono Medical Center, 142 F.3d 138, 142 (3d Cir.1998).  Defendants argue that they are entitled to summary judgment because Shaw was not a "qualified individual with a disability" within the definition of the ADA.[3]  Furthermore, Defendants claim that Shaw has failed to create a genuine issue of material fact regarding his retaliation claims.  For the following reasons, we agree, and will grant summary judgment and dismiss this case.

### A.    Disability

In order to be considered "disabled" under the ADA, a plaintiff must establish that he: 1) has a physical or mental impairment[4] that substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an

---

[3] Claims under the PHRA are analyzed under the same standard as the ADA.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).  Thus, we will not discuss the two statutes separately.

[4] The parties do not dispute that Shaw's rotator cuff  injury is a physical impairment. The EEOC regulations broadly define "physical impairment" as including any physiological condition affecting the...musculoskeletal systems. See 29 C.F.R. § 1630.2(h)(1).  The EEOC regulations, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

impairment.  42 U.S.C.A. § 12102(2); 29 C.F.R § 1630.2(g); <u>Toyota Motor Mfg., Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 187, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).  Shaw argues that his work-related rotator cuff injury constitutes a disability under the ADA, and even if it did not, Chamberlain considered him disabled.  We will address these issues separately, and for the following reasons, disagree.

### 1.     Actual Disability

"Whether an individual has a disability under the ADA is an individualized inquiry." <u>Sutton v. United Airlines, Inc.</u>, 527 U.S. 471, 483 (1999).  "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."  <u>Id.</u>; <u>see also</u> <u>Settle v. S.W. Rodgers, Co., Inc.</u>, 998 F. Supp. 657, 662 (E.D. Va. 1998) ("[a]s courts have consistently and sensibly noted, the ADA's individualized focus requires a case-by-case determination of whether a particular plaintiff's impairment is disabling" because "some rotator cuff injuries may be so severe as to limit a person's major life activities in some respect, while others may not.").  Therefore, the proper inquiry for this element is whether Shaw's rotator cuff injury substantially limited one or more of his major life activities.

Shaw has alleges that he is disabled under the ADA because his injury substantially

limited the major life functions of working, lifting, and reaching.[5]  He argues that he is limited in reaching and lifting over seventy-five pounds, and is substantially limited in his working ability because he cannot perform the class of jobs requiring reaching and lifting over seventy-five pounds.

"Whether a particular impairment substantially limits a major life activity requires an individualized assessment on a case-by-case basis."  See Toyota Motor Mfg. Ky. Inc. V. Williams, 534 U.S. 184, 199 (2002).  The Third Circuit employs the EEOC's two-step analysis in making the determination whether an individual is substantially limited in one or more major life activities.  Lombardo v. Air Prod. and Chem. Inc., No. 05-1120, 2006 WL 18926 (E.D. Pa. July 7, 2006) (citing Mondzelewski v. Pathmark Stores, 162 F.3d 778, 783-84 (3d. Cir. 1998)); see 29 C.F.R. pt. 1630, app. § 1630.2(j).  The court first determines whether or not the individual is substantially limited in any major life activity other than working.  Id. (emphasis added).  "If the court finds that the individual is substantially limited in any of these major life activities, the inquiry ends there.  On the other hand, if the individual is not so limited, the court's next step is to determine whether the individual is substantially limited in the major life activity of working."  Id.  The EEOC has defined "substantially limited" as (1) "unable to perform a major life activity that the average person

---

[5]Shaw also alleges that his impairment has limited his ability to play volleyball or golf, lift weights, shovel snow, do yard work, and help build a deck onto his house. (Shaw Dep.173-74, 240.) These claims are not applicable because it is well-established that recreational activities are not major life activities.  See, e.g., Weber v. Strippit, Inc., 186 F.3d 907 (8th Cir. 1999) (shoveling snow, gardening, playing tennis, fishing, and hiking not major life activities).

in the general population can perform"; or (2) "significantly restricted as to the condition, manner, or duration under which an individual [the plaintiff] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i)-(ii).  The EEOC has provided the following factors to aid the determination: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Although Shaw correctly alleges that lifting and reaching are major life activities, the weight restrictions placed upon him by his physicians did not constitute a "substantial limitation" on lifting.  See Marinelli v. City of Erie, Pa., 216 F.3d 354, 363 (3d.Cir. 2000).  In Marinelli, the court found that a city employee's lifting restrictions of more than ten pounds did not constitute a "substantial limitation" on a major life activity, as required to establish a claim under the ADA.  Id. at 364 (citing Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346 (4th Cir. 1996) (twenty-five pound lifting restriction is not significantly limiting)).  When Shaw sought to return to work, he was restricted to a ten to twenty-five pound lifting range, well above the ten pound restriction that the Marinelli court found did not constitute a substantial limitation.[6]

---

[6] Although Shaw's medical records indicate periods of greater lifting restrictions, these periods were brief and temporary, and thus, he does not have a record an impairment that substantially limited a major life activity.

In addition, we find that Shaw was not substantially limited in his ability to work.  The term, "substantially limits," in the context of "working", is defined as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 CFR § 1630.2(j)(3)(I);  Murphy v. United Parcel Service, Inc., 527 U.S. 516, 517 (1999).  Thus, "one must be precluded from more than one type of job, a specialized job, or a particular job choice."  Tice v. Centre Area Transp. Auth., 247 F.3d 506, 512 (3d Cir. 2001) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999)).  "If a host of different jobs are available, one is not precluded from a broad range of jobs."  Sutton, 527 U.S. at 491.

Relying on Williams v. Philadelphia Hous. Auth. Police Dept., 380 F.3d 751, 763 (3d Cir. 2004), Shaw argues that he was substantially limited in working because he could not perform the class of jobs that requires lifting over seventy-five pounds.  In Williams, a former police officer was unable to carry a firearm due to his severe depression, a condition that "temporarily limited the jobs that were available to him to those jobs that do not require him to carry a firearm."  380 F.3d at 763.  The court found that law enforcement constituted a class of jobs, and a reasonable jury could determine that the plaintiff's inability to carry a firearm significantly restricted his ability to work in law enforcement compared to the average person with comparable training, skills, and ability.  Id.

Unlike Williams, Shaw does not argue that he was precluded from performing a broad class of jobs, such as law enforcement.  Other classes of jobs include, for example,

15

meatpacker, pilot, or chef.   See Marinelli, 21 F.3d at 364.  Shaw does not argue that he is

precluded from performing work as a laborer or manufacturer, but instead argues that he

cannot perform jobs that include his particular lifting restrictions.[7]

In Sutton v. United Air Lines, Inc., the Supreme Court rejected an ADA claim made

by myopic job applicants who challenged an airline's minimum vision requirement for the

job of "global airline pilot."  527 U.S. 471, 493 (1999).  The Court held that the plaintiffs

"failed to allege adequately that their poor eyesight is regarded as a [substantially limiting]

impairment" because they only alleged that they were precluded from the position of "global

airline pilot" which is "a single job" for a particular company and "the inability to perform a

single particular job does not constitute a substantial limitation in the major life activity of

working."  Id. (quoting 29 C.F.R. § 1630.2(j)(3)(I) (1998)).  In addition, the Court rejected

plaintiffs' argument that "if one were to assume that a substantial number of airline carriers

have similar vision requirements, they would be substantially limited in the major life activity

of working."  Id.  The Court found this reasoning to be "flawed" because "it is not enough to

say that if the physical criteria of a single employer were imputed to all similar employers one

would be regarded as substantially limited in the major life activity of working only as a

result of this imputation."  Id. (emphasis in original).

---

[7] Plaintiff's brief argues he cannot perform jobs requiring lifting over seventy-five pounds. Although those are his current restrictions, at the time of the alleged discrimination, he was permanently restricted to lifting between ten and twenty-five pounds.  Thus, viewing the evidence in a light most favorable to the plaintiff, we will discuss his restriction as twenty-five, rather than seventy-five, pounds.

In Marinelli, the court found that no reasonable juror could find that the inability to lift over ten pounds substantially limits the life activity of working.  216 F.3d at 364-66.  There, the plaintiff was limited to jobs with a "medium range of exertion" and could not lift more than ten pounds.  Id. at 363-64.  He argued that he was substantially limited in his ability to work because he could not continue his job on the "shift crew" for the municipality, which required that he answer telephones, respond to emergency needs for labor, pump gas, and plow snow, because his arm pain prevented him from plowing snow.  Id. at 357.  The court found this argument insufficient because the plaintiff was able to perform all of his other duties, and he demonstrated solely that he was unable to plow snow under the conditions of his particular job.  Id.

Similarly, Shaw has testified that he could perform the vast majority of the laborer tasks at Chamberlain, and was restricted from performing his pre-injury job solely because it required that he rotate among various laborer positions, some of which required that he perform lifting beyond his restrictions.  As in Sutton, Shaw only alleged that he was precluded from the position of laborer at Chamberlain which is a "single job" with a particular company.  Id.  This does not constitute a substantial limitation on the major life activity of working.  Furthermore, Shaw cannot assume that a substantial number of companies who employ "laborers" have similar lifting and rotation requirements because "it is not enough to say that if the physical criteria of a single employer were *imputed* to all similar employers one would be regarded as substantially limited in the major life activity of

17

working *only as a result of this imputation*." Id.  Shaw has presented no evidence that all

employers hiring laborers or manufacturers require their employees to lift over twenty-five

pounds or rotate through jobs that include this requirement.  Therefore, we find that Shaw

has failed to create a genuine issue of material fact that he was substantially limited in his

ability to work because he failed to demonstrate that his restrictions prevented him from

working in a broad range of jobs or a class of jobs such as laborer or manufacturer.

Accordingly, we find he has failed to create a genuine issue of material fact that he was

actually disabled.

## II. Regarded As Disabled

Shaw also avers that Chamberlain regarded him as disabled because a Chamberlain

representative called him "disabled" during the December 2003/January 2004 meeting

between union representatives and Chamberlain.  Shaw testified that Chamberlain's nurse as

well as another official referred to him as "disabled."  When the official said he was disabled,

Shaw explained, "the whole conversation was about me to come back [sic] to work and the

way they were refusing and that, no, he is disabled, like if I am broke."  (Shaw Dep. 218).

To establish that the plaintiff was "regarded as" disabled, the plaintiff must show that

he has:

> (1) a physical or mental impairment that does not substantially limit major life
> activities but is treated by a covered entity as constituting such limitation;  (2) a
> physical or mental impairment that substantially limits major life activities only
> as a result of the attitudes of  others toward such impairment; or (3) none of the
> impairments defined [by the regulations]...but is treated by a covered entity as
> having a substantially limiting impairment.

Sever v. Henderson, 381 F. Supp. 2d 405, 416 (M.D. Pa. 2005) (citing 29 C.F.R. § 1630.2(I)(1)-(3)).   "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action."   Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996).   Instead, the plaintiff must show that the employer believed that a major life activity was substantially limited by the plaintiff's impairment.   Sever, 381 F. Supp. 2d at 416.   In a "regarded as" claim, "the definition of 'substantially limits' remains the same as it does in other parts of the statute-i.e., if the individual is attempting to establish that the employer believed the individual to be limited in the life activity of 'working,' then 'working' must encompass a broad class of jobs."   Tice, 247 F.3d at 514; see also Sutton, 527 U.S. at 492 (stating that a "regarded as" plaintiff is required to show that the employer regards him or her as unable to work in a broad class of jobs.).   The Third Circuit has found that an employer "regarded" an employee as disabled when the employer believed that the employee was unable to perform a wide range of jobs, not just his or her previous position. See Taylor v. Pathmark Stores Inc., 177 F.3d 180, 188 (3d Cir. 1999).

Although Chamberlain's nurse and an official referred to Shaw as "disabled" during the December 2003/January 2004 meeting, it is clear that Chamberlain did not perceive him as unable to perform a wide range of jobs, but only perceived him as unable to perform his pre-injury position at Chamberlain.   Shaw admitted that "disabled" comment occurred in the context of determining whether he could perform his past work.   (Shaw Dep. 218)   In

addition, the meeting discussed his ability to work with thirty pound shells and his previous job, not his ability to work a wide range of jobs. (Id. at 138-39) Moreover, it is undisputed that in the time period in question Chamberlain regarded Shaw as unable to lift more than ten to twenty-five pounds. From the time Shaw sought to return to work, this was the limitation that his doctors consistently applied until they raised it to fifty to seventy-five pounds, and Chamberlain refused to allow him to return to work because Shaw's doctor believed this restriction was permanent. Chamberlain regarded his impairment precisely as it was: he could not lift more than ten to twenty-five pounds and could not perform his pre-injury job at Chamberlain. It considered him only unable to perform a single job at a single employer, but believed he was able work a wide range and class of jobs. Thus, Chamberlain neither treated him as substantially limited in a major life activity, nor was Shaw substantially limited in a major life activity as a result of Chamberlain's attitude towards his impairment.

Moreover, during the period where Shaw alleges Chamberlain engaged in discrimination, confusion existed as to whether Shaw would be permanently restricted from working in his previous position as laborer because no permanent light duty position existed at Chamberlain. Shaw was not returned to work because of the conflicting reports as to whether he could perform his prior position of laborer. During this time period, Chamberlain, in light of the conflicting medical reports, sought to determine whether Shaw would ever be able to work in his prior job classification as laborer. It was, in fact, engaged in a process to determine whether he could return to his prior position. See Haulbrook v.

20

Michelin N. Am., Inc., 252 F.3d 696, 703-04 (4th Cir. 2001) (holding that it would "fly in the face of common sense" to find that an employee was regarded as substantially limited in working where employer made repeated efforts to secure employee's return to the workforce).  Thus, Chamberlain did not believe Shaw to be substantially limited in the major life activity.  Accordingly, Plaintiff failed to established either that he was actually disabled or that Chamberlain regarded him as such, and we will dismiss his ADA discrimination claims.[8]

### B.      Retaliation

The ADA prohibits employer's from retaliating against employees for opposing any activity made unlawful under the ADA.  Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751, 758-59 (3d Cir. 2004).  "No personal shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing, under this chapter."  42 U.S.C. 12203(a). An ADA retaliation claim based on a request for an accommodation does not require that the plaintiff establish he was disabled.  Williams, 380 at 759 n.2.

The three part burden shifting analysis announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to ADA retaliation claims.  Id. at 760 n.3.  First, the

---

[8] In addition, even if Shaw could establish a prima facie case of discrimination, for the reasons discussed more fully below, we find that his discrimination claims fail because he has not created a genuine issue of material fact that Chamberlain's legitimate reasons for the adverse employment actions were pretext for discrimination.

plaintiff must establish a prima facie case.  Id.  "In order to establish a prima facie case of

illegal retaliation under the anti-discrimination statues, a plaintiff must show: (1) protected

employee activity; (2) adverse action by the employer either after or contemporaneous with

the employee's protected activity; and (3) a causal connection between the employee's

protected activity and the employer's adverse action."  Id. at 259 (quoting Shellenberger v.

Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003)).  If the plaintiff can establish a

prima facie case, the burden shifts to the defendant to articulate some legitimate non-

discriminatory reason for the action.  Id. at 260 n.3.  Finally, the plaintiff then must prove by

a preponderance of the evidence that the legitimate reasons offered by the defendant were not

its true reasons, but were pretext for discrimination.  Id.

The plaintiff can create a genuine issue of material fact that the nondiscriminatory

explanation is pretext "only if he submits evidence from which a factfinder could reasonably

either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an

invidious discriminatory reason was more likely than not a motivating or determinative cause

of the employer's action."  Connors v. Chrysler Financial Corp., 160 F.3d 971, 974 n.2 (3d

Cir. 1998).  Under the first option, "a plaintiff can cast sufficient doubt on a defendant's

legitimate non-discriminatory reason by showing 'weaknesses, implausibilities,

inconsistencies, incoherences, or contradictions in the employer's proffered legitimate

reasons for its action [such] that a reasonable fact finder could rationally find them unworthy

of credence.'"  Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir.

22

1996) (quoting <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000)).

Under the second option, "the plaintiff may show that the employer has previously

discriminated against [the plaintiff], that the employer has previously discriminated against

other persons within the plaintiff's protected class, or that the employer has treated more

favorably similarly situated persons not within the protected class." <u>Simpson v. Kay</u>

<u>Jewelers</u>, 142 F.3d 639, 645 (3d Cir. 1998) (citing <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d

Cir. 1994)).

Shaw argues that he engaged in protected activity when he received worker's

compensation and requested to return with light duty restrictions.  He maintains that

Chamberlain retaliated against him by: 1) refusing to hire him for a permanent light duty

position in June and September of 2003 and instead hiring Karen Kane to find a position for

him outside of the company; and 2) delaying his return to work in December 2003/January

2004 and insisting on an IME after Dr. Mogerman alleviated the lifting restrictions in

December of 2003.

Assuming that Shaw can establish a prima facie case, we find that he has produced

insufficient evidence to rebut the defendants' legitimate non-discriminatory reasons for

refusing to hire him for permanent light duty work and for delaying his return in 2004.  <u>Jones</u>

<u>v. Sch. Dist.</u>, 198 F.3d 403, 410 (3d Cir. 1999) ("most [discrimination] cases turn on the third

stage, <i>i.e.</i> can the plaintiff establish pretext").

Chamberlain has explained that it hired Karen Kane to find a position for Shaw

outside the company in June of 2003 because at the time Shaw's medical records indicated

that he was permanently restricted to light duty work, and it had no permanent light duty

positions.[9]  Although some light duty tasks were available, it reserved these duties for

employees recovering from temporary injuries.  Plaintiff argues that the defendants

explanation is pretext because they had light duty tasks available.  Plaintiff has produced no

evidence, however, to rebut Chamberlain's assertion that it had no permanent light duty

position available.  Furthermore, Chamberlain's reasoning is supported by their record of

accommodating Shaw on a temporary basis.  In 2002, when Dr. Mogerman released Shaw to

return to temporary light duty work, Chamberlain allowed him to perform light duty tasks at

full pay.  It was only when he requested a permanent light duty position, which they did not

have, that they hired Karen Kane to locate a full-time light duty position for Shaw.

_____Similarly, we find that Shaw has failed to create a genuine issue of material fact that

Chamberlain's explanation for delaying his rehire in 2004 was pretext for discrimination.

Chamberlain explained that it needed another medical opinion after Dr. Mogerman released

him to work and alleviated his lifting restrictions to fifty to seventy pounds in December of

2003.  Only six months prior, Dr. Mogerman had opined that Shaw would be permanently

restricted.  Furthermore, in January 2004, Dr. Greco opined that Shaw would be permanently

restricted.  Thus, Chamberlain sought an independent medical examination to resolve the

---

[9] "The ADA does not require an employer to create a new position to accommodate an employee." Buskirk v. Apollo Metals, 307 F.3d 160, 169 (3d Cir. 2002) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)).

discrepancies prior to allowing Shaw to return to work.

Shaw argues that this explanation is implausible because there were no conflicting medical reports because it is typical for a doctor to change an assessment if a patient improves.  First, this argument ignores Dr. Greco's January 2004 opinion that Shaw would be permanently restricted, which conflicts with Dr. Mogerman's opinion at that time that he could lift fifty to seventy pounds.  In addition, Shaw's argument mischaracterizes Dr. Mogerman's view of June through September of 2003, which was that Shaw was permanently limited to light duty.  Although patients frequently improve with treatment, Dr. Mogerman's opinion that he was permanently limited indicated that he felt that treatment would not improve Shaw's impairment.  Thus, when he opined that Shaw did improve, his opinion contradicted his previous view.

Therefore, we find that Shaw has failed to create a genuine issue of material fact that Chamberlain's legitimate non-discriminatory reasons were pretext for retaliation or discrimination, and we will grant summary judgment on claims under the ADA and PHRA.  As we will grant summary judgment on both Shaw's discrimination and retaliation claims, we will also grant summary judgment on his claim against the individual defendants.  Accordingly, we will grant summary judgment on each count and will dismiss the case.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARLEN SHAW,** | : | **No. 3:05cv1344** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **CHAMBERLAIN MANUFACTURING** | : | |
| **CORP., d/b/a CHAMBERLAIN,** | : | |
| **JIM NAYAVICH, JAMES FLAHERTY,** | : | |
| **and DAURICE HOLLY-FEBBO,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>ORDER</u>

**AND NOW**, to wit, this 17th day of August 2006, Defendants' Motion for Summary Judgment (Doc. 15) is hereby **GRANTED**.  The Clerk of Court is directed to enter judgment on behalf of the defendants and close this case in this district.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**

26